Good afternoon, your honors, and good afternoon, counsel. May it please the court, I'd like to reserve maybe three minutes for rebuttal. My name is Winn Eaton, and I represent Ruben Huezo-Cedillos v. Robert Wilkinson. I'd like to make one point, which is I'm not sure you really need 15 minutes in this case, and if you don't, I'd appreciate it if you didn't take it. Thank you. Okay, I'm having a little trouble hearing, your honor, but I'll... All I said was that I'm not sure you actually need 15 minutes in this case. I'm not sure why we have it down for that much argument, and if you don't need it, it would be better if you don't take it. Thank you. Okay, well, at any rate, I represent the petitioner. I'll refer to him as Ruben. This case involves the reinstatement of a removal order against an individual who for 20 years, and with minimal literacy in English language, represented himself. Ruben trusted that the U.S. legal system would treat him fairly and would protect him from the grave harm he faced in El Salvador, but it did not. I'd like to focus my time today on the immigration judge's erroneous denial of protection under the Convention Against Torture. Ruben was forced to join a gang as a youth in El Salvador, and forcibly branded for life with gang tattoos, which he still has today. And later, when he refused to help the gang, they slashed his throat and shot his father. He moved around all over the country trying to avoid the gang. He's never committed a crime in furtherance of the gang objectives, and that's in the record at 49 and 50. He was deported in 2017 and was immediately recognized by an officer at the Repatriation Center in San Salvador as being in danger of being killed, and that's in the record at 48. He lived in hiding for a short time before being returned to the United States to seek safety once again. And even the El Salvadorian consulate, after he returned here, recognized the serious harm that Ruben faced, and that's in the record at 48. I have three topics that I'd really like to present, but in order of priority, I don't think we'll get to anything but the I've been focusing on that. The failure of the immigration judge and the BIA to consider evidence in the record in the applicable laws interpreted by this court in Covey Holder is the primary issue. The immigration judge adopted early on at a master county. I think there's a large problem with that. When was Covey decided? I think in 2003. Yeah, Covey was decided in 2011, I believe, at Covey Holder. 2011? All right, but was the record from the same time period? It's a different country, wasn't it? Yeah, well, it's Honduras is where Covey Holder pertains. So I don't understand how we can rely on the record in that case. Well, Your Honor, what we're talking about is the same MS-13 gangs and the other gangs, sometimes the same individuals operating across the common border and assaulting the same victims and perpetrating the same crimes with sometimes the same guns and the same drugs. And then when we look at the country conditions report that was also ignored throughout the record here at the 337, 344, 345, 351, they also indicate that the same issues are in El Salvador as they are in Honduras. But isn't, I mean, to me, the bigger problem is that the IJ's opinion doesn't contain a great deal of what was in the record about what happened to him. Well, early on, as I was saying, Your Honor, the immigration judge seemed to adopt a philosophy that DHS advanced at 173 to discount persecution that occurred prior to petitioner's removal in 2017. And that's at 174, 75, and 76 is that conversation. And then that contrasts strongly with the U.S. Supreme Court's recent decision in Nostralla, where prior facts must be considered for CAT. CAT is not a removal order, it's a deferral. And so we're not talking about reopening a removal order with this argument on CAT. We have to go back and reference Reyes-Melendez, Lopez-Reyes, V.I.N.S., back to Wang, V.I.N.S. I don't read the opinion that way. He doesn't say the earlier material is irrelevant. He just doesn't seem to think that it carries much weight. But he's accurate about it. I mean, he says that he testified that he was jumped into the gang against his will and when he refused, he was stabbed in the neck. That's not exactly, that's not what happened, right? No, that's not really what happened at all. The judge conjectured in a number of places, just engaging in speculation and opinion at 161, 162, 164. In the meantime, he began supporting a number of gang-related tattoos. But I thought the evidence was that he was voluntarily tattooed. Yeah, that's exactly right, Your Honor. He did not just all of a sudden adopt a life in the gang as Judge O'Brien seems to depict there. This happened over a period of five years where he's desperately searching for safety across this country. His father and family tried to protect him. His father was shot four times and left for dead. His throat was slid. A plastic stent was put in his throat to keep him alive when his jugular vein was bleeding him out. That the respondent was willing to engage in criminal behavior is a parent-based criminal record here in the United States. I thought it's a criminal record. There were several arrests, but what were the convictions? Yeah, Your Honor, if I may, the criminal arrest, and we don't want to get into post-conviction relief efforts, but they are pending in Sonoma County because he basically was self-represented there, too, and he was coerced by telling, look, your kids are taken away if you don't enter a plea to that 273.5 conviction, and he was given time served on a 360-day sentence, but we believe that's going to be overturned because it was completely misrepresented. At that point, he didn't understand English and it was a very unfair proceeding, but... The respondent never attempted to explain how he remained a member of MS-13 for years, had tattoos on his body, remained an unwilling participant in the gang activities, but I thought he did explain it. In fact, he said he didn't participate in the gang activities at all, basically. He refused to do it. Yeah, I think you'll find that in the record at 46 and 47, 48, where he testifies, but, you know, the judge wouldn't know that because we don't think he spent any time there, and he misrepresented and entered into conjecture, which is not permitted by this court's ruling, and he hasn't considered the evidence of torture, which is well established at 291 through 302, and... And then there were two instances where he was told by officials of the government that he was going to be in danger if he walked out or did anything, and that's not the IJ opinion at all, right? No, it's not. And then when we get to the aggregate issues, the immigration judge just seems to ignore the record, and there's no analysis as required by this court in analyzing, nor the BIA, which essentially adopted the entire judge's record by not rendering, weighing in on their own analyses, which is required. So we think that the record is pretty strong when taken in the totality, particularly when contrasted with the El Salvadorian country conditions in comparison, particularly this court's decision in cold. So one of the things that it seemed the agency did in responding to, or in addressing the record, was to suggest that that claim was speculative because your client could conceal any tattoos. How do you respond to that? Well, in the record at 46, 47, 48, the testimony from Ruben, which really, his testimony, if it's compelling, which it was not but essentially what Ruben said about that is it's a common practice in El Salvador for the police. If there's an accident, they'll lift up your shirt. You know, the immigration judge seemed to enter into a speculation that common parlance in El Salvador is the same here. We don't have Terry v. Ohio where the police require reasonable suspicion to do a stop. Everyone is stopped and there's so well established evidence that in El Salvador, people are randomly disappeared and brutally murdered. Their families are tortured, whether it's by gangs or whether it's by vigilante groups that are often made up of police and military people, particularly like Ruben. And then the other thing, the immigration judge failed to aggregate the concern about. He has strong testimony from others that have told him that if, you know, and Ruben suffers from a heart condition and a lack of oxygen in his lungs, it's in the record as well, I believe 48 thereabouts, but he is very concerned that the evidence shows that his medical care would be deprived because as soon as they see those gang tattoos, they're not going to give the treatment that he needs to keep him alive. Now, the other aspect here is there is no differentiation between somebody who's 18 and somebody who's an adult as the immigration judge states in his opinion that because Ruben is now 40 years old, there's somehow that exempts him from the gang attacks. And that's complete conjecture, which is not permitted by this the CAT claims. So nothing to indicate the respondent would be identified as a gang member is absolutely false. Gang tattoos forced in him as a child at the 45, we'll see that at 47, 48, the 2018 statements by the consular officer at the Mesa Verde detention center indicate that the police and military already know who he is, there's apparent communication. I don't know how the officer at the repatriation terminal knew that he was a gang member and told him, look, if you go out that door, they're going to shoot you and we're going to stand by and do nothing. And that's at 47, 48. And the judge also seems to contradict himself at in the record on 52, where he says country conditions evidence in the record does not establish that gang members are those with tattoos and indicate membership in a gang or single singled off for persecution. And then later, the immigration judge says, well, at 337, he says there is evidence in the record that extrajudicial killings of suspected gang members do happen in El Salvador. So a reasonable to believe standard that the respondent would be able to explain that is just complete speculation and conjecture on the part of the immigration judge. And that's not permitted by the whole litany of cases from Reyes Melendez to sing. This court has held for decades. And again, like I say, this, you know, the terror of the Ohio standard does not apply in El Salvador. The court has made a number of errors here. And I think the reasonable thing to do would be to we would not favor this court necessarily remanding without instruction because the BIA had their opportunity to review the case. They did not. And the BIA adopted the IJ's decision in its entirety. And we think that any reasonable review of the facts and the country conditions and the other article on Panama to a death sentence of somebody with his circumstances and similarly situated is removed El Salvador. He's also a prior TPS holder. And he lost the TPS in 2006 because he was trying to represent himself. He had no idea what what he was doing. And that's why we think that he will at some point be granted TPS or possibly adjustment status once again, as soon as we get through the vacature up in Sonoma County, which undermined his entire future here. I'm sorry. It is not his only conviction. There was some kind of an issue. It was a minor issue. I don't remember what it was, but the government that's a good point, though, the government seems to indicate that he had this drug conviction. This fellow has never used drugs or possessed drugs at all. He was on his way home at one point while he was working up in Sonoma County. And this fellow gave him a ride home, had a problem. So they got out of the car. He had to stop on his way to try to get him to a hearing so he could do his domestic violence classes due to the plea he entered. And the fellow threw some drugs down on the ground. And when some reason the police came, I don't know what the facts were, but he said they weren't his. They were both arrested. There was no conviction there. That was a charge not resulting in conviction. There was no conviction. All right. Thank you. Your time is up. Thank you so much. Thank you, Your Honor. Mr. Fisher. Hello, I'm back. So I think I just wanted to make sure that we understood that this case is similar but different. It's a different procedural posture because in this case, the petitioner got through the credible fear step and it went to the immigration judge. And then the immigration judge determined that petitioner did not meet his burden of proof for withholding and cat eligibility. And so the issue here is whether or not substantial evidence supports those two agency determinations. And I'm not going to talk about the particular social groups because petitioner's counsel didn't seem to emphasize that. I wish, I will volunteer, I wish that the IJ's opinion was clearer in terms of cognizability versus nexus, particularly because I think a lot of the nexus analysis he imported to the likelihood of future torture in his discussion of this particular petitioner and what harm he might have done. Judge Berzon is something that came up in Cole. These tattoos, I think what the IJ focused on is that they're not visible. And I didn't, I think there are unreported cases on non-visible tattoos. And I think this is what's interesting, not visible, but two different officers of the El Salvador government who encountered petitioner seemed to know for some reason that it was gang connection, told him that it was in danger. Yes. And that obviously was troubling. It's troubling in that, but I'm not sure it was fully fleshed out in the testimony as to how they would know how they knew. And therefore, I'm not sure how. For one thing, it appears that his name was on the radio broadcast as being a gang member by some group that was trying to, a physiologic group that was trying to get rid of gang members. But Your Honor, I don't know that his... He was tried for murder and apparently acquitted or let out. And then he was on the radio. So he may have been notorious. I don't know. It appears that his name might be known. It may be, but Your Honor, I'm not sure that that's established by the evidence in the record or by his testimony. And so what we're left with... Is it established that in fact he was tried and in fact he was broadcast on the radio by name of a gang member? That is what he testified to, yes. But I don't think that that incident, that fact was linked in any way with the two... What troubles me the most, which is that is not in the IJ's order, a decision, nor is the fact that these two officers of the El Salvador government identified him as a gang member and warned him that he was in danger. That's not in the IJ order. And the IJ order is inaccurate with respect to his testimony about what happened to him when he was 12 or 13 years old because he says that he was cut and beaten because he resisted the gang's recruitment efforts, which is not exactly what he said. It's not what he said. It was a couple of years later and he appears to become a member of the gang and participated in its activities. But he says he actually stayed away from them as much as he could and didn't. And when they asked him something he didn't do, which is why he was attacked. And also it says the IJ said that he got himself tattooed and his testimony was that he was involuntarily tattooed. So there's inaccuracies and mutual omissions in the IJ opinion. I agree, Your Honor, that the IJ's opinion is not as clear as it ought to have been. I still think there's an issue, however, with hidden covered tattoos. To the extent they're hidden and to the extent that he's older now, it's not clear that the evidence establishes that he would be recognized or identified as a target of torture. And I think that's what he needed to show. Counsel, could I ask you a question about that? Because it seems to me that that's the problem, that the IJ thought this was going to be a speculative encounter that might happen. And to me, that's why it's so important that the IJ misunderstood his testimony and failed to account for these other episodes where government officials absolutely knew that he was a prior gang member. Isn't that kind of the point on appeal here? That seems to be what's so troubling that that was not engaged in. I think the issue was, if you look at the testimony, it was extremely confused and unclear and hard to follow and very, very hard to follow. And that's part of his burden, Your Honor, to have laid that out. If the IJ had said, he said this, but it was unclear and speculative and I'm not going to credit it, that would be one thing. But if he just ignores it isn't that a different problem? I don't think it leads Mr. Eaton where he wants to go to the granting of CAT as opposed to a redo. But why doesn't there at least have to be a redo where the actual evidence in the record is taken into account? Yes, Your Honor. The other issue here is that the board didn't attempt to clarify. But I think that the speculative finding still rests on the hidden nature of the tattoos and the fact that he's not in a different position than anyone else. And if his testimony didn't play out why he was, whether he was, I agree that the IJ shouldn't have totally ignored it, but I'm not sure that it doesn't necessarily get him to where he wants to be. But counsel, I'm confused now about your position. It may get him to an opinion where somebody does take it to account for it. Go ahead, Your Honor. I'm sorry. So we're just trying to follow and we're not trying to talk over you or each other. It's just difficult with a delay. But counsel, I'm trying to make sure I understand your position. In response, just a second ago, to some questions, you indicated, you know, yes, when Judge Berzon said, you know, we may need to have a do-over so this evidence can be accounted for because it really hasn't been accounted for at all. And then then you said, well, I don't think it gets him where he needs to go, wants to go. We just mean an out and out grant of that. So I'm trying to figure out whether you're agreeing that this case needs to be sent back so that we can get some findings on the evidence actually presented. Is that your position or are you still? No, I'm not. I'm not going to agree that the case needs to be sent back. I'm going to agree that the IJ's opinion is not as on a number of issues. But I still think the speculative nature of the postulated harm is solid and that he hasn't shown that he is in a different position because his tattoos are hidden and because there's no reason from the testimony to surmise. Well, but there is reason if you make them go to that point. One is that his name was on the radio as a gang member. Another is that he was in fact recognized as a gang member by two different, by El Salvador official when he came back and he was recognized as a gang member by an El Salvador person who he met while he was in the United States detention facility. So it's unusual, but there is evidence and it's not in the opinion. That's the big problem. It's not an opinion, but I don't think that that evidence ties, that there's nothing from the testimony and I went back and looked at it. It's so unclear, but there's nothing that it's not established by that even knew about his tattoos. No, it's not about tattoos. It's former gang membership. One way or another, the point is whether they can see those tattoos or not, they knew about his former gang membership. They warned him about it. That's a massive problem. I'm not sure that that's, that is evident from the testimony. It may have been just these people speculate, though you be careful out there because if you're a former gang member, but they, if there's nothing that actually, but, but we both read in the, and the testimony is about being warned by a woman at the border facility that arrival, the arrival gang members outside. And then it was going to be tacked that they would try to kill him. I agree. It's clearly English is not his first language. And then the, and then the caution is you could go out there. We're going to lock it up. We can't, we're not going to let you back in and we're not going to go out and try to save you. So anyway, I just keep coming back to this. The problem with that is that let's give you one more shot that the IJ says it's speculative, right? That people are going to know that he's in a gang because his tattoos are, are, you can conceal them. But the problem is we've got a track record again, three times where people did know it is a gang member. And so that has, and the IJ hasn't engaged in any of that evidence. That's my problem. And I would appreciate your response. I will concede to you that it would have been better if the IJ had engaged with the evidence, but I don't think the evidence suggests what he is saying is that it doesn't show that the woman who quote, warned him was aware of his gang status at all, his former gang status. And I think that's what the IJ was going to. There's nothing that is, it is totally. I think that's exactly what he said about the council person in the, in the American detention facility. He said to someone else, that guy is a gang member. I have to beg your pardon, your honor, because the testimony was so unclear on this point, but I'm not sure that that's what the implication was that he knew specifically that that guy was a gang member. But I will agree with the panel that I wish that the IJ had discussed this evidence and that it had been fleshed out. Did the IJ make any findings whether the petitioner had been subjected to past torture? And if the IJ didn't do that, does that satisfy the IJ's obligation to consider all of the evidence that could suggest the likelihood of future torture, including past torture? But were there any findings about past torture? So this was, no, and, and that's, that this raises the same issue that we had in the first case of whether or not the IJ needs to make a definitive determination that past harm rises to the that finding was, was missing here also. That's why I said at the beginning that I thought it was important that he imported the nexus analysis to, to discuss those incidents of past torture, not because you need a nexus in the future, but in analyzing them from that standpoint, you then can decide whether or not you think there's a likelihood of future torture or it happening again. That's what I think these two cases have in common. And interestingly enough. Okay. But so is there a finding in the, with regard to the nexus question about whether it rose to the level of persecution? No. And no, there's a finding that there was no nexus, but there's no finding as to whether or not it goes to the level of persecution. And it would be pretty difficult given the fact that when he was a relatively small child, his throat was cut by these people and his father was, was shot many times. Now there may be a, a, an acquiescence issue at that point, but as to whether it rises to the level of torture, I mean, maybe the reason it's not there is because it's obvious. I think that the IJ said at a certain point, and I apologize because our brief has this wrong, but the IJ said, if he, if his throat was cut and he was beaten, then it appears, then, then, then that would rise to the level of past persecution. So then the question didn't make a specific finding as to torture with the acquiescence of the government sort of glommed together. So it's hard to know whether to talk about with the acquiescence of or whether it didn't rise to the level of torture. Yeah. I think that's exactly right. I think that's exactly right. But I do think that it's partly because of the nature of what happened to him. The IJ was viewing that as not likely to happen in the future. So, and while there's this long line of cases like AIDU and NURU that spout black letter that the most important factor is whether or not there was torture in the past. I don't think it's fair to say that this IJ hasn't thoroughly analyzed and vetted the past torture factor. He just decided, I think, that it didn't, um, wasn't there a publicly made death threat to him by this black shadow on the radio? Right. And, and, and you're right. The IJ, as you pointed out, didn't engage with that piece of evidence in terms of the likelihood of future torture. There's no question about that. Thank you. The argument in which is Jaffe versus Google. Thank you, your honors.
judges: Berzon, Christen, Bade